## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| **ROBERT CINCINNATI,** | : | CASE NO. _____ |
| C/O ERIC HOLLOWAY LAW GROUP, LLC | : | |
| 5650 BLAZER PARKWAY, SUITE 100 | : | |
| DUBLIN, OHIO 43017 | : | DISTRICT JUDGE _____ |
| | : | |
| PLAINTIFF, | : | |
| | : | |
| V. | : | MAGISTRATE JUDGE _____ |
| | : | |
| UNITED STATES POSTAL SERVICE | : | |
| 475 L'ENFANT PLAZA, SW | : | |
| WASHINGTON, D.C. 20260-0010, | : | |
| | : | |
| AND | : | |
| | : | |
| POSTMASTER GENERAL | : | |
| LOUIS DEJOY | : | |
| UNITED STATES POSTAL SERVICE | : | |
| 475 L'ENFANT PLAZA, SW | : | |
| WASHINGTON, D.C. 20260-0010. | : | |
| | : | |
| DEFENDANTS. | : | |

**COMPLAINT FOR MONEY DAMAGES, DECLARATORY RELIEF AND
INJUNCTIVE RELIEF WITH JURY DEMAND ENDORSED HEREON**

Plaintiff Robert Cincinnati presents this Complaint for Money Damages, Declaratory Judgment, and Injunctive Relief due to Defendants' unlawful efforts to impair his federally protected rights related to the use of medical leave.  He alleges:

### I.   Introduction and Preliminary Statement

1. Plaintiff Robert Cincinnati has endured medical conditions since approximately 2017.  He has endured injuries to his knees requiring surgery.  Each one arose from working as a postal carrier since 2004.  At approximately age 56, in June 2017, he began to receive medical care for his left knee.  He underwent an operation on it in August 2017.  He was scheduled to return to work in

October 2017.  He then required medical care for his right knee, starting in November 2017.  He underwent an operation on his right knee in May 2018. He did not receive authorization to return to work after that procedure although his doctor released him to work with limited restrictions. He had the same return to work restrictions from his doctor in 20118 as he had in 2017. He was not allowed to return to work until February 2020 in the German Village Post Office in Columbus, Ohio.

### II. Overview of Claims, Jurisdiction, Venue and Parties

2. Mr. Cincinnati reincorporates by reference as if fully rewritten all prior paragraphs of this Complaint.

3. This matter arises due to Defendants' illegal conduct under federal law.  Defendants violated at least the Family and Medical Leave Act, 29 USC §§ 2601 *et seq.* as amended.
This matter also seeks relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201.

4. Pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4), this Court has jurisdiction over the federal claims asserted in this Complaint.

5. All operative facts giving rise to this Complaint occurred within Franklin County, City of Columbus, Ohio.  Venue is proper in this Division. Defendants are federal defendants under 28 U.S.C. § 1339.

6. Mr. Robert Cincinnati, a citizen, has resided in Columbus in Franklin County, Ohio at all times relevant to this action.

7. Defendant United State Postal Service, USPS, is an agency of the federal government. It employs Mr. Cincinnati.

8. Defendant Louis DeJoy is the Postmaster General of the United States, effective June 15, 2020. General DeJoy is the head of the relevant federal executive agency. Mr. Cincinnati sues him in his official capacity. *See* 28 U.S.C. § 2000e-16(c).

9. At all times relevant, Mr. Cincinnati and each Defendant has worked in or has been located in Franklin County, Ohio.

10. Mr. Cincinnati is a "person" and an "employee" as defined in the Family Medical Leave Act, 29 USC § 2601 *et seq.* (FMLA).

11. Each Defendant is an "individual" and/or "employer" as defined in the FMLA and other applicable federal statutes relevant to this lawsuit.

### III. Facts

#### A. Work History and Duties; Events Leading to Unlawful Conduct

12. Mr. Cincinnati incorporates by reference as if fully rewritten all previous paragraphs of this Complaint.

13. At all times relevant, Mr. Cincinnati has worked for the United States Postal Services as a Letter Carrier at the same post office under the supervision of Postmaster Maureen Gerst-Stewart.

14. The allegations contained in this Complaint arise out of the same transactions and/or series of events and thus involve multiple violations of rules and regulations under the Family and Medical Leave Act. Such actions and violations continue to this day.

15. Mr. Cincinnati is an eligible employee as defined in 29 U.S.C. § 2611(2).

16. Defendant USPS is an "employer" as defined in 29 U.S.C. § 11(4) and 29 C.F.R. § 825.109.

17. At all times relevant, Mr. Cincinnati had certification to be off on medical leave to attend to and recover from medical procedure, including but not limited to surgery.

18. Like many other Letter Carriers, Mr. Cincinnati has served in the military. He served in the United States Army Reserves (Reserve and Active Duty). On or about 9/17/2001, he was honorably discharged from the Army with a 30% medical disability due to migraine headaches. He had 16 years of combined service in the Army at that point. He medically retired at the rank of Sergeant (E-5), assigned to the 577th Engineer Battalion as a construction equipment operator.

19. Mr. Cincinnati started as a part-time employee for twenty months in the Whitehall, Ohio Post Office, having started on or about August 24, 2004. In 2006, he started to work at the German Village Post Office as a full time, regular Letter Carrier. As of this filing, Mr. Cincinnati has almost 32 years of combined service with the federal government.

20. Prior to encountering issues with his knees, in 2013 and into 2014, Mr. Cincinnati had issues with alcoholism. Those issues never led to any disciplinary action against him at work. Still, he realized on his own that he did needed help. He called the station manager at the time, Dan Schmidt, who told him to go get help. He did.

21. In December 2014, Mr. Cincinnati checked himself into an in-patient 30-day rehab center, Springhill Recovery in Massachusetts. His medical doctor signed a return to work letter. He was supposed to return to work on December 29, 2014.

22. On December 29, 2014, Mr. Cincinnati arrived for work. He was denied entry to work.

23. In early 2015, USPS local management took off the rolls of letter carriers. The Union fought to get him back, to which USPS management eventually agreed. As part of that agreement, though,

he had to endure a 2-year last chance probation. He signed that agreement on or about March 20, 2015. He had to adhere to the terms of probation and never be late or missed work.

24. In or around early March 2016, Sue Renee Conn and Jarrell Howell (who had just started as Station Manager) were doing street operations. They saw Mr. Cincinnati who was wearing a Gulf War hat, not his uniform hat. Mr. Cincinnati explained to them that his work hat was at home. He asked if they wanted him to go home and get it. They told him no. Still, they wrote him up the next morning for not wearing his work hat. Other postal workers wore their own hats all the time and still do.

25. On or about November 15, 2016, Jarrell Howell accused Mr. Cincinnati of being drunk. Mr. Cincinnati was escorted to a facility where he blew a 0.00 BAC on the breathalyzer. Jarrell Howell had only been at Mr. Cincinnati's station for two days when he made this accusation

26. On or about November 16, 2016, Sue Rene and Jarrell Howell were removed from their respective positions and reassigned. Sue Rene was sent to Grove City as a floor supervisor.

27. On or about December 1, 2016, Jarrell Howell and MCSO Ed Thorne had an altercation at work. Jarrell Howell was escorted off the premises.

28. On or about December 2, 2016, Sue Rene granted Jarrell Howell 136 hours of FMLA until that dispute calmed down.

29. On or about December 8, 2016 Mark Beach, NALC Union Branch 78 VP & Formal A Rep, wrote a letter regarding issues at the German Village, Ohio Post Office. The issues focused on Jarrell Howell who had apparently terminated female employees who did not respond well to his sexual advances. Mark Beach also referred to the fact that Doug Bryant, German Village

Steward, had not noticed any issues with Mr. Cincinnati and alcohol on his breath on the day in question. Mark Beach wrote that he followed protocol and reached out to Postmaster Administrative Assistant Lee Bossa to set up an interview with Jarrell Powell. However, Jarrell Powell was on FMLA leave and unavailable to be interviewed. Mark Beach then contacted MCSO Ed Thorne and got no response. Finally, he was able to learn from Lee Bossa that Jarrell Powell had an altercation with Ed Thorne and was escorted out of the facility and would not return until the new year. However, Mark Beach was never given the information he requested for the Union's investigation.

30. On or about December 14, 2016, Jarrell Powell sent an email to many postal workers explaining that he did not want to be sent back to work at a facility where he would be under Ed Thorne after what happened on December 1, 2016.

31. On January 20, 2017, the Union President filed a grievance over this. Jarrell Powell was removed from management. Jarrell Howell still owes Mr. Cincinnati a letter of apology regarding his false accusation against him.

### B. Mr. Cincinnati Developed a Pain in his Knee That Required Medical Help

32. On or about June 28, 2017, Mr. Cincinnati consulted with Dr. Gregory Stover regarding pain and swelling in his left knee. Dr. Stover wrote for Mr. Cincinnati a Return to Work letter for July 15, 2017. The letter had the following restrictions: allow to sit as needed, avoid steps, avoid climbing, squatting and no kneeling, no lifting greater than ten pounds for three months. Mr. Cincinnati provided this letter to Defendants via hand delivery after receiving it from Dr. Stover.

33. On or about August 1, 2017, Dr. Stover diagnosed Mr. Cincinnati with a torn medial meniscus in his left knee and discussed surgery with Mr. Cincinnati.

34. On or about August 3, 2017, Dr. Stover wrote that Mr. Cincinnati was to be off work from June 28, 2017 to October 5, 2017.

35. On or about August 24, 2017, Dr. Stover operated on Mr. Cincinnati's left knee.

### C. Mr. Cincinnati Received Medical Approval to Return to Work, Which Defendants Ignored.

36. On or about September 5, 2017, Mr. Cincinnati called Dr. Stover's office and reported that he was having difficulties with his job and not being paid.

37. On or about September 6, 2017, after having post-op check with Dr. Gregory Stover, Mr. Cincinnati received a return to work date of October 11, 2017. As it turned out, Mr. Cincinnati would need additional medical intervention.

38. During the November 6, 2017, visit with Dr. Stover, Mr. Cincinnati also shared with Dr. Stover that his right knee was now locking up.

39. On or about December 5, 2017, Mr. Cincinnati called Dr. Stover to request a new return to work letter with light duty restrictions. Mr. Cincinnati provided this letter to Defendants via hand delivery shortly after receiving it from Dr. Stover. As it turned out, Mr. Cincinnati would need additional medical intervention.

40. On or about January 19, 2018, Mr. Cincinnati called Dr. Stover's office to request to be seen for his right knee.

41. On or about February 14, 2018, Dr. Stover submitted a return to work letter for Mr. Cincinnati after his seeing Mr. Cincinnati for pain in right knee. The following restrictions were given: allow

to sit as needed, avoid steps, avoid climbing, squatting and no kneeling, no lifting greater than ten pounds for four months. Mr. Cincinnati provided this letter to Defendants via hand delivery shortly after receiving it from Dr. Stover. Defendants never responded. As it turned out, Mr. Cincinnati would need additional medical intervention.

42. On or about March 14, 2018, Mr. Cincinnati called Dr. Stover's office saying that he blew his knee out two weeks prior and was not allowed to work while on crutches. He requested a letter that would state that he had to be off work until after his scheduled MRI.

43. On or about May 2, 2018, Dr. Stover saw and examined Mr. Cincinnati. Dr. Stover scheduled surgery for his right knee.

44. On or about May 21, 2018, Mr. Cincinnati received a warning letter from work regarding his extended absence. A pre-disciplinary meeting was set for June 8, 2018.

45. On or about May 29, 2018, Dr. Stover operated on Mr. Cincinnati's right knee.

46. On or about June 14, 2019, Mr. Cincinnati received a letter of warning for his unsatisfactory attendance at work. Yet, Defendants had not allowed Mr. Cincinnati to return to work yet, and he was not receiving any regular salary or benefits.

47. On or about June 22, 2018, Defendant USPS denied the light-duty restrictions from Dr. Stover. Defendants did not agree that Mr. Cincinnati could return to work yet.

48. On or about July 7, 2018, Mr. Cincinnati received another warning letter regarding his extended absence from work. Yet, Defendants had not allowed Mr. Cincinnati to return to work yet, and he was not receiving any regular salary or benefits.

49. On or about July 27, 2018, Mr. Cincinnati received notice that he was suspended for seven (7) days due to his attendance. Yet, Defendants had not allowed Mr. Cincinnati to return to work yet, and he was not receiving any regular salary or benefits.

50. On or about August 24, 2018, a Union Vice-President emailed Maureen Gerst-Stewart to request a formal denial of Mr. Cincinnati's light duty request. That would enable that Union official to work with Mr. Cincinnati's doctor to correct the problem. The Union received no reply of any kind in 2018.

51. On or about September 7, 2018, U.S. Senator Sherrod Brown wrote a letter to Melvin Anderson, District Manager for Ohio Valley USPS. Senator Brown asked for assistance on behalf of Mr. Cincinnati. Mr. Cincinnati had been assigned to return to work at a new location which he was unable to get to due to transportation issues.

52. On or about October 9, 2018, Senator Brown wrote a letter to Mr. Cincinnati. The letter stated that USPS had reassigned Mr. Cincinnati to the West Worthington, Ohio Post Office and supposedly had failed to appear (which would have been due only to transportation issues).

53. Mr. Cincinnati never was formally transferred to the West Worthington post office. Defendants did not call – or mail him – to tell him this. Instead, they relayed the message through a co-worker. Mr. Cincinnati received a phone call from the co-worker on or before October 9, 2019.

54. On or about November 21, 2018, Mr. Cincinnati received a 14-day suspension due only to his attendance. Yet, Defendants had not allowed Mr. Cincinnati to return to work yet, and he was not receiving any regular salary or benefits.

55. On or about December 8, 2018, Defendant USPS issued a Return to Work Notice of Personnel Action for Mr. Cincinnati. Yet, Defendants had not allowed Mr. Cincinnati to return to work yet, and he was not receiving any regular salary or benefits.

56. On or about December 20, 2018, Defendant USPS sent to Mr. Cincinnati a warning letter about his extended absence from work. It set a pre-disciplinary meeting for December 28, 2018. Yet Defendants had not allowed Mr. Cincinnati to return to work yet, and he was not receiving any salary or benefits.

57. On or about February 14, 2019, Mr. Cincinnati saw Dr. Stover regarding pain again in his left knee. He also had a visible limp. Dr. Stover provided return to work date of February 18, 2019, with the following restrictions: allow to sit as needed, avoid steps, avoid climbing, squatting and no kneeling, no lifting greater than twenty pounds for three months. Yet, Defendants had not allowed Mr. Cincinnati to return to work, and he was not receiving any regular salary or benefits.

58. With time, Mr. Cincinnati's left knee recovered some, and he fortunately did not need another surgical intervention for that knee. He required no more surgical interventions on his right knee either. Other than limited work restrictions, Mr. Cincinnati finally was fit and able to work. Defendants did not permit him to work, though.

59. On or about May 17, 2019, Defendant USPS finally processed Mr. Cincinnati's return to work via a notice of personnel action. Still, it refused to allow him to return to work, and Mr. Cincinnati still was not receiving any regular salary or benefits.

60. On or about May 20, 2019, Defendant USPS sent to Mr. Cincinnati a notice of involuntary administrative salary offsets under the debt collection act. Reportedly, he owed Defendant USPS

$545.15 for various, unspecified deductions. Yet, Defendants had not allowed Mr. Cincinnati to return to work yet, and he was not receiving any regular salary or benefits.

61. On or about July 31, 2019, Dr. Stover submitted another return to work letter with the following restrictions: allow to sit as needed, no lifting greater than 35 pounds, avoid climbing from August 5, 2019 to May 5, 2020. Mr. Cincinnati provided this letter to Defendants via hand delivery shortly after receiving it from Dr. Stover. Defendants ignored this letter.

62. On August 1, 2019, Defendant USPS, through Harold Peetz, mailed Mr. Cincinnati paperwork seeking information to process an ADA accommodation. Defendant USPS received such information from Mr. Cincinnati via Dr. Stover's Return to Work letter dated July 31, 2019.

63. Defendant USPS issued a personnel action notice, returning Mr. Cincinnati to work effective May 17, 2019.

64. Defendants still refused not allow Mr. Cincinnati to return to work.

65. On or about January 22, 2020, Defendants sent to Mr. Cincinnati a notice to attend a pre-disciplinary hearing January 23, 2020. Yet, Defendants had not allowed Mr. Cincinnati to return to work yet, and he was not receiving any regular salary or benefits.

66. On or about February 26, 2020, Defendants finally allowed Mr. Cincinnati to return to work.

67. At all times relevant, Defendants acted willfully to violate Mr. Cincinnati's rights under the FMLA. They knew he had such rights. They chose to ignore his rights. They chose to pursue discipline against him for using his rights. They chose to bar his return to work, proximately causing him to suffer injuries and damages.

### D. Injuries and Damages

68. Due to Defendants' individual and/or joint wrongful acts or omissions, Mr. Cincinnati has experienced and/or continues to experience compensable damages. Such damages include but are not limited to as follows: pain and suffering that could require or continues to require medical care and mental health care, suffered at least temporary if not permanent psychic injury, anguish, severe emotional distress, mental distress, pain and suffering, and other physical, emotional and psychological injuries.

69. Due to Defendants' individual and/or joint wrongful acts or omissions, Mr. Cincinnati suffered and will continue to suffer economic and non-economic harm and damages. Such harm and damages include, but are not limited to, back pay because Defendants have not paid Mr. Cincinnati for time that he could have worked but Defendants barred him from working; front pay; past and future economic and non-economic losses; loss of salary and fringe benefits, to include but not limited to converting his 401k and/or retirement savings, and other privileges and conditions of employment.

70. Mr. Cincinnati earned $28.69/hour in 2016 through 2019, and he earns $31.27/hour in 2020. Mr. Cincinnati earns non-pay benefits, to include but not limited to annual leave; sick leave; annual leave exchange; life insurance; health benefits; thrift savings plan (a tax-deferred retirement savings and investment plan, akin to a 401(k) plan); flexible spending accounts for health care and dependent care expenses; retirement via the Federal Employees Retirement System; and long term care insurance offerings. He understands that the value of his non-monetary benefits is equal to thirty percent (30%) of his hourly wage, or $37.00/hour. Mr.

Cincinnati has missed at least $6,460 in back pay and benefits per month while Defendants unlawfully denied him the right to return to work since at least May 17, 2019.

71. Defendants' discriminatory actions against Mr. Cincinnati were purposeful, willful, reckless and/or malicious. Their actions make each Defendant jointly and severally liable for Mr. Cincinnati's past and future economic and non-economic compensatory and punitive damages. Their actions entitle Mr. Cincinnati to recover attorney fees and reasonable costs and expenses, pursuant to the FMLA and other applicable law.

72. Defendants' acts and omissions proximately and directly caused Mr. Cincinnati to endure injuries and damages. Those injuries and damages include, but not limited to, the following: loss of earnings and earning capacity; loss of career opportunities; loss of fringe benefits; mental anguish; physical and emotional distress; humiliation and embarrassment; loss of professional reputation; and loss of the ordinary pleasures of everyday life, to include but not limited to pursuing gainful employment of his choice.

73. Additionally, Mr. Cincinnati has incurred medical and legal expenses.

### IV.   Claims for Relief

**A.   First and Second Claims for Relief – FMLA Interference and Retaliation**

74. Mr. Cincinnati incorporates by reference all prior paragraphs of the Complaint as if fully rewritten.

75. While employed, Mr. Cincinnati endured one or more serious medical health conditions, per 29 USC § 2611. He is an eligible employee under the FMLA, which he conveyed to Defendants. Defendants are employers under the FMLA.

76. Defendants, who are employers under the FMLA, knew of Mr. Cincinnati's serious medical health condition(s).

77. Defendants knew Mr. Cincinnati faced a medical necessity which required his to receive ongoing periodic medical leave for treatment and care.

78. Mr. Cincinnati provided Defendants with notice of his need for leave as fully practical under the circumstances.

79. Defendants informed Mr. Cincinnati that he may take leave under the FMLA consistent with its applicable regulations, policies, procedures and practices. Thus, Mr. Cincinnati was entitled to medical leave under the FMLA. Mr. Cincinnati gave notice to his employer of his intent to take such leave.

80. Defendants offered to and provided Mr. Cincinnati leave under the FMLA consistent with its applicable regulations, policies, procedures and practices.

81. Mr. Cincinnati received return to work letters from his treating surgeon. He delivered them to Defendants.

82. Defendants did not permit Mr. Cincinnati to return to work. Instead, they started procedures to discipline him for not reporting to work – which Mr. Cincinnati in fact had done. It was Defendants who caused him to miss work by not permitting him to return to work. Defendants also thus have denied Mr. Cincinnati FMLA benefits to which he was entitled.

83. Defendants issued three separate notices for pre-disciplinary hearings after Mr. Cincinnati had informed them that he had a return to work letter from his medical doctor.

84. Mr. Cincinnati returned to work in February 2020. Since that time, Defendants have created a hostile work environment. They have harassed Mr. Cincinnati. They have retaliated against him for using his leave permitted under the FMLA.

85. Defendants have not paid Mr. Cincinnati for pay he would have earned had Defendants allowed him to return to work.

86. Defendants have not honored Mr. Cincinnati's seniority.

87. Defendants' agents at Mr. Cincinnati's work location have a reputation for retaliating against postal workers who use FMLA leave.

88. Despite such knowledge of retaliation by their agents, Defendants cultivated a culture of retaliation. That resulted in Mr. Cincinnati facing retaliation at work since returning to work in 2020.

89. Defendants nor its agents did anything to protect Mr. Cincinnati from such misconduct and illegal actions as expressed in this Complaint.

90. Defendants thereby have ratified and approved their agents' illegal misconduct directed at Mr. Cincinnati.

91. Per 29 U.S.C. § 2612(a)(1)(A), no employer may, "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter."

92. Defendants violated the FMLA and at least 29 U.S.C. § 2612(a)(1)(A), by interfering with such rights and retaliating against Mr. Cincinnati for using and trying to use his rights under the FMLA.

93. Mr. Cincinnati never received notice that he exceeded any leave or time balance available to him under the FMLA.

94. Defendants and its agents lack any good faith basis or reasonable grounds to believe they did not violate the FMLA in how they treated Mr. Cincinnati.

95. Defendants have a practice of refusing to comply with statutory and regulatory requirements under the FMLA. That practice constitutes willful interference with the rights of covered employees under the FMLA, to include but not limited to 29 U.S.C. § 2315(a).

96. Defendants' illegal misconduct violates 29 U.S.C. §§ 2615(a)(1) and 2615(a)(2).

97. Defendants interfered with Mr. Cincinnati's FMLA rights. They effectively terminated his employment because he took leave or had leave available to here.

98. The FMLA permits using such leave or having it available.

99. Defendants pursued such misconduct, in whole or in part, to interfere with Mr. Cincinnati's rights under the FMLA.  They pursued such misconduct, in whole or in part, to retaliate against Mr. Cincinnati.

100.    As a direct result of Defendants' unlawful conduct, which Mr. Cincinnati has alleged in this Complaint, Mr. Cincinnati has endured damages. Such damages include, and are not limited, to as follows: back pay, lost benefits, mental and emotional stress, loss of personal property, anxiety, humiliation, embarrassment, attorney's fees and costs in addition to other past, present, and future damages.

101.    Due to Defendants' misconduct and violation of at least 29 U.S.C. § 2917(a) and other provisions of the FMLA, Plaintiff is entitled to receive from Defendants monetary damages, to

include but not limited, to as follows: back pay, future pay, benefits, and other compensation and losses that he has incurred. Mr. Cincinnati also is entitled to receive from Defendants monetary damages for emotional distress, mental anguish, interest, liquidated damages. Mr. Cincinnati also is entitled to receive from Defendants appropriate equitable relief, reasonable attorney's fees, reasonable expert witness fees, filing fee, and other reasonable litigation costs.

102. Defendants are liable for economic damages, pre-judgment interest, and attorney fees per 29 USC § 2617.

103. Defendants did not act in good faith; they acted willfully. Thus, Mr. Cincinnati may recover liquidated damages, related costs, and expenses per 29 U.S.C. § 2617.

## V.     Jury Demand

104. Mr. Cincinnati requests a jury trial as to all claims triable to a jury.

## VI.     Prayer for Relief

WHEREFORE, Plaintiff Cincinnati demands judgment as follows:

A. Award Plaintiff Cincinnati compensatory damages against Defendants in an amount to be established at trial;

B. Award Plaintiff Cincinnati liquidated or punitive damages against Defendants as appropriate in an amount to be established at trial;

C. Award Plaintiff Cincinnati back pay and front pay, if applicable.

D. Award Plaintiff Cincinnati reasonable attorney fees and costs pursuant to 42 U.S.C. § 1988, FMLA, and any other applicable law;

E. Award Plaintiff Cincinnati prejudgment interest and post-judgment interest

F.  Grant injunctive relief to cure all violations Defendants cause and to require Defendants not to repeat such violations in the future.

G.  Award Plaintiff Cincinnati any other and other relief which Plaintiff Cincinnati may receive under applicable law or equity and to which the Court considers proper.

Respectfully submitted,

**Eric Holloway Law Group, LLC**

s/ *J. Eric Holloway*
_____
J. Eric Holloway (0063857)
5650 Blazer Parkway, Suite 100
Dublin, OH 43017
614-526-8552 (D); 614-522-6789 (Fax)
Eric@EricHollowayLaw.com;
www.EricHollowayLaw.com
Trial Counsel for Plaintiff Robert Cincinnati